**IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION**

TESLA MOTORS, INC., a Delaware
corporation

             Plaintiff

      v.

RUTH JOHNSON, in her official capacity
as Secretary of State and Chief Motor
Vehicle Administrator, BILL SCHUETTE,
in his official capacity as Attorney General,
and RICK SNYDER, in his official capacity
as Governor

             Defendants.

_____/

Case No. 16-cv-1158

HON. JANET T. NEFF

## SECOND AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

Tesla Motors, Inc. ("Tesla") brings this lawsuit to vindicate its rights under the United States Constitution to sell and service its critically-acclaimed, all-electric vehicles at Tesla-owned facilities in the State of Michigan. Tesla seeks, on an expedited basis, a declaratory judgment that Michigan Compiled Laws section 445.1574 ("Section 445.1574"), including its recent "Anti-Tesla" amendment, violates the Due Process, Equal Protection, and Commerce Clauses of the Constitution as applied to Tesla by prohibiting Tesla from selling its vehicles directly to consumers and by precluding Tesla from performing service and repairs within the State. Tesla also seeks a permanent injunction preventing State officials from enforcing Section 445.1574 against Tesla.

## INTRODUCTION

1.      Tesla is an American company whose mission is to accelerate the advent of sustainable transport and energy.  Among other things, Tesla designs, manufactures, and sells the world's most advanced zero-emissions, all-electric vehicles.  And, while many other companies have moved manufacturing jobs overseas, Tesla designs, builds, and sells cars here in the United States, employing thousands in well-paying jobs.

2.      Tesla has catalyzed the electric vehicle industry worldwide.  Founded in 2003, Tesla has delivered more than 185,000 cars to date, proving to the market that electric cars can be as desirable as they are environmentally sound, and can eventually replace the gasoline-powered cars that have rolled off of factory lines for more than 100 years.

3.      Tesla's vehicles have been met with resounding acclaim, with Tesla's Model S receiving *Car and Driver*'s prestigious "Car of the Century" award and the National Highway Traffic Safety Administration's highest possible safety ratings.  Similarly, a 2015 *Consumer Reports* survey ranked Tesla's service centers first in the United States for on-time repairs, courtesy, price, quality, and overall satisfaction.  Building on these successes, in March 2016, Tesla unveiled the Model 3, a more affordable, mass-market, electric vehicle set to begin production in late 2017.  On May 18, 2016, Tesla publicly reported that customers had paid to reserve approximately 373,000 Model 3 cars.

4.      From its inception, Tesla determined that it could not succeed by selling and servicing its vehicles through a traditional network of third-party dealers, and the high-pressure, commissions-driven sales environment they foster.  Because Tesla is new to the industry, and because all-electric vehicles are new to most customers, Tesla's sales model has focused on educating consumers about its products and technology in a low-key, low-pressure environment.  For example, unlike traditional car dealerships, Tesla sells its cars at uniform and transparent

prices based on the configuration and options that a customer selects for the vehicle.  Thus, at Tesla, customers will never be rushed into a purchase, haggle over the price of the car, wonder if they could get a better deal across town, or puzzle over confusing add-on products, like GAP insurance or rust-proofing. Tesla's results, measured by sales and Tesla's superlative survey rankings, show that this model has immense benefits for consumers.

5.    While customers have welcomed Tesla with open arms, groups of industry incumbents, including some dealer associations across the country, have viewed Tesla as a threat to their local monopoly power over automobile distribution.  Rather than try to compete with Tesla, some of these well-connected players have tried to block Tesla from local markets altogether by lobbying state legislatures for protectionist legislation.

6.    Particularly egregious protectionist legislation was passed by the Michigan Legislature in 2014.  Under pressure from the deeply entrenched automobile dealer's lobby, the Michigan Legislature quietly enacted an outright ban on Tesla's direct-to-consumer sales model, effectively giving franchised dealers a state-sponsored monopoly on car sales within Michigan. The Legislature did so by amending a statute that prohibited a franchising manufacturer from competing against "its" independent, franchised dealers—which Tesla does not use—to require, for the first time in Michigan's history, that all new car sales be conducted exclusively through franchised dealers.  This new ban made its way through the Legislature covertly, with the Legislature bypassing the public notice-and-comment process to shield the bill from scrutiny or debate.  Then, at the urging of the franchised dealers and General Motors (which considers Tesla a competitive threat to its own electric vehicle programs), the bill was signed into law by Governor Rick Snyder and was codified in revised Michigan Compiled Laws Section 445.1574. The new law was immediately recognized by the public for what it was: a highly protectionist,

dealer-driven law intended to shut Tesla out of Michigan.  It was aptly dubbed the "Anti-Tesla bill."

7.      By design, amended Section 445.1574 effectively bans Tesla's sales and distribution model within the State of Michigan.  In particular, Section 445.1574 prohibits motor vehicle manufacturers from selling their vehicles through manufacturer-owned facilities within the State, instead requiring all manufacturers to contract with independent, franchised dealers to sell their cars.  As the vehicle dealer lobby and General Motors were well aware, Section 445.1574 effectively precludes Tesla from selling its cars within the State of Michigan because the dealer model is not viable for Tesla.

8.      Section 445.1574(1)(q) even bars Tesla from establishing in-state facilities to service and repair Tesla vehicles purchased by Michigan residents in another state or over the Internet.  Thus, when applied to Tesla, Section 445.1574 impedes and complicates Tesla owners' ability to obtain needed repairs.  Additionally, Section 445.1574 precludes Tesla from selling used cars in Michigan.  Although Michigan otherwise imposes minimal requirements for establishing a used car dealership, which Tesla could easily meet, Section 445.1574 irrationally prohibits Tesla from engaging in that business.

9.      Section 445.1574's prohibitions violate Tesla's rights under the U.S. Constitution. As applied to Tesla, Section 445.1574 blocks Tesla from pursuing legitimate business activities and subjects it to arbitrary and unreasonable regulation in violation of the Due Process Clause of the Fourteenth Amendment; subjects Tesla to arbitrary and unreasonable classifications in violation of the Equal Protection Clause of the Fourteenth Amendment; and discriminates against interstate commerce and restricts the free flow of goods between states in violation of the dormant Commerce Clause.  The sole purpose for applying Section 445.1574 to a non-

4

franchising manufacturer like Tesla is to insulate Michigan's entrenched automobile dealers and manufacturers from competition.  This is not a legitimate government interest under the U.S. Constitution.

10.     Section 445.1574 serves no interests other than those of two discrete private groups—Michigan's independent franchised dealers and Michigan-based vehicle manufacturers—to the great expense and detriment of Tesla and Michigan consumers alike. Michigan supports those special interests by requiring vehicle manufacturers to create a costly and unnecessary Michigan-only franchised-dealer network simply to participate in the Michigan market.  Tesla asks the Court to eliminate this Michigan-sanctioned trade zone; permit Tesla to provide necessary maintenance and repair services to Michigan's Tesla owners; and restore Tesla's right to compete fairly for the business of Michigan consumers, an outcome that will reduce prices, create jobs, and allow Michigan consumers—not Michigan car dealers or legislators—to choose which vehicles and distribution model they prefer.

## JURISDICTION AND VENUE

11.     Tesla brings this lawsuit pursuant to the Civil Rights Act of 1871, 42 U.S.C. § 1983, and alleges violations of the Fourteenth Amendment to, and the Commerce Clause of, the U.S. Constitution.

12.     Tesla seeks declaratory and injunctive relief against the enforcement of Section 445.1574 against Tesla, and against the practices and policies of the Secretary of State that deprive Tesla of its right to sell and service Tesla vehicles at Tesla-owned facilities within the State.

13.     This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331, 1367, 1343, and 2201.

14.     Venue lies in this District pursuant to 28 U.S.C. § 1391(b).

## PARTIES

### Tesla

15.     Tesla is an American company that designs, develops, and manufactures electric vehicles and provides service and support to owners of its vehicles.  Electric vehicles currently comprise less than 1% of new car sales in the United States, and Tesla's mission is, among other things, to accelerate the world's transition to electric mobility by bringing to market a full fleet of increasingly affordable electric vehicles.

### Defendants

16.     Defendant Ruth Johnson is the Secretary of State and is sued in her official capacity. Defendant Johnson is, and at all relevant times was, an employee of the State of Michigan.  As Secretary of State, Defendant Johnson also serves, and at all relevant times served, as the Chief Motor Vehicle Administrator.

17.     Defendant Bill Schuette is the Attorney General of the State of Michigan and is sued in his official capacity.  Defendant Schuette is, and at all relevant times was, an employee of the State of Michigan with authority to enforce Michigan law.

18.     Defendant Rick Snyder is the Governor of the State of Michigan and is sued in his official capacity.  Defendant Snyder is, and at all relevant times was, an employee of the State of Michigan vested by the Michigan Constitution with the executive power of the State, including the power to supervise each of the principal departments of the executive branch of the State government.

19.     Defendants Johnson, Schuette, and Snyder (collectively "Defendants"), and their agents and employees performed, participated in, aided, and/or abetted in the acts described below under color of law and directly and/or proximately caused the injuries described below.

6

## FACTUAL ALLEGATIONS

### Tesla's Critically-Acclaimed Vehicles

20.     Tesla began bringing vehicles to market just five years after its founding.  Its first offering was the Tesla Roadster, released in 2008, which was the first commercially-produced, highway-capable, all-electric vehicle made in the United States.  The Roadster was a high-performance sports car with a battery range of 245 miles, the longest range of any production vehicle up until that time.

21.     Building on the Roadster's success, in 2012, Tesla introduced the Model S, a full-sized, all-electric luxury sedan with a range of 265 miles per charge.[1]  The market's response was overwhelming.  In 2013, Model S was named *Motor Trend* Car of the Year[2] and was recognized by *Consumer Reports* for "the highest owner-satisfaction score Consumer Reports has seen in years: 99 out of 100."[3]  A 2014 *Consumer Reports* survey found that "98 percent of Model S owners [said] they would definitely purchase it again."[4]  In 2015, *Car and Driver* named Model S the "Car of the Century,"[5] an award given in the prior century to the Ford Model T.  In addition, Model S consistently receives a five-star safety rating (the highest possible) in each testing category from the National Highway Traffic Safety Administration.[6]  By 2015, Model S was the

---

[1] The most recent variant of Model S (P100D) has a range of 315 miles per charge.

[2] *2013 Motor Trend Car of the Year: Tesla Model S* (November 12, 2012), http://www.motortrend.com/news/2013-motor-trend-car-of-the-year-tesla-model-s/.

[3] *Tesla Model S Takes the Top Spot in Consumer Reports Car Owner-Satisfaction Ratings* (November 21, 2013), http://pressroom.consumerreports.org/pressroom/2013/11/my-entry-2.html.

[4] *Would You Buy Your Car Again? Consumer Reports' annual car owner satisfaction survey* (December 2014), http://www.consumerreports.org/cro/2012/12/owner-satisfaction/index.htm.

[5] *2015 Tesla Model S 70D, The car of the century, now updated with more power and AWD* (May 2015), http://www.caranddriver.com/reviews/2015-tesla-model-s-70d-instrumented-test-review).

[6] http://www.safercar.gov/Vehicle+Shoppers/5-Star+Safety+Ratings/2011-Newer+Vehicles/Search-Results?searchtype=manufacturer&manufacturer=151.

best-selling plug-in electric vehicle in both the United States and worldwide,[7] and was the best-selling large luxury vehicle of any kind in the United States.[8]

22.     In September 2015, Tesla began delivery of its third vehicle, the Model X, a luxury sport utility vehicle.  And in March 2016, Tesla began accepting reservations for its fourth vehicle, the Model 3, a lower-cost sedan set to enter production in late 2017.  Demand for the Model 3 has been unprecedented, with more than 325,000 reservations placed (with a deposit of $1,000 each) within a week after Model 3 reservations were opened, implying approximately $14 billion in future sales and making Model 3's launch the largest one-week product launch ever—all without advertisements, paid endorsements, or guerilla marketing campaigns.  By May 15, 2016, Tesla had logged approximately 373,000 Model 3 reservations.

### Tesla's Direct Sales and Service Model

23.     Tesla attributes much of its success to its unique direct sales-and-service model. Tesla markets and sells its vehicles directly to consumers over the Internet (at www.tesla.com) and through a worldwide network of stores owned and operated by Tesla.  In contrast to other manufacturers, Tesla does not sell its vehicles through independent, franchised dealers, i.e., third-party dealers who sell vehicles pursuant to franchise agreements with manufacturers.  Similarly, to ensure the highest quality service, Tesla provides service and repairs for its vehicles through Tesla-owned service facilities; it does not contract with third parties to service its cars.  A 2015 *Consumer Reports* survey ranked Tesla's service centers first in the United States, beating out all independently-owned and dealer-owned service centers, for on-time repairs, courtesy, price,

---

[7] *Tesla Model S Was World's Best-Selling Plug-in Car in 2015* (January 12, 2016), http://www.hybridcars.com/tesla-model-s-was-worlds-best-selling-plug-in-car-in-2015/.

[8] http://files.shareholder.com/downloads/ABEA-4CW8X0/0x0x874449/945B9CF5-86DA-4C35-B03C-4892824F058D/Q4_15_Tesla_Update_Letter.pdf.

quality, and overall satisfaction.[9]  At present, Tesla lawfully operates stores in 23 states and the District of Columbia, and lawfully operates service facilities in 24 states.

24.     Selling a Tesla car is very different from selling a traditional, gas-powered car.  The public remains largely unfamiliar with, and often skeptical of, electric vehicle technology. Accordingly, Tesla's retail operations are tailored to address the concerns of consumers considering the transition to electric vehicles, as well as to showcase Tesla's products and services. Thus, in any given Tesla store, potential customers will encounter a welcoming environment staffed with knowledgeable employees ready to educate consumers about, for example, how electric cars work; what it means that Tesla cars are "dual motor" and have regenerative braking; how the car can be charged at home (e.g., what equipment is needed, what charging will cost, and how long it will take); how Tesla's network of charging stations, called "Superchargers," facilitate long-distance travel; maintenance costs, compared to a gas-powered car (e.g., because electric cars have no oil to change or engine to tune); the difference in fuel costs (since electric cars require no gas); and tax incentives for electric vehicle owners.  The list goes on.  Electric vehicle ownership is simply far different than owning and operating a traditional, gas-powered car, and it takes a unique and patient approach to educate consumers about it.

25.     Thus, by design, the experience at a Tesla store is nothing like the traditional car-buying process.  Independent dealers typically rely on fast, high-volume sales at the highest negotiable price, and frequently pressure customers to purchase add-ons and services that they do not want or need.  By contrast, Tesla sells its cars at uniform and transparent list prices, which

---

[9] *Independent vs. dealer shops for car repair, A Consumer Reports survey shows how dealerships and independent shops compare by brand* (January 22, 2015), http://www.consumerreports.org/cro/magazine/2015/03/best-places-to-get-your-car-repaired/index.htm.

depend on the configurations of and options for each car.  Tesla customers pay the same price whether they purchase through Tesla's website, at a local store, or at a store in a different state. This system eliminates the haggling and hidden fees that have contributed to consumer mistrust of automobile dealers.

26.     Tesla also compensates its employees in a manner that encourages a low-pressure retail experience and high-quality repair service.  Tesla has sales employees who are primarily salaried and whose role is to educate consumers about Tesla cars, rather than push for a same-day sale that will yield a commission.  Tesla also compensates its service employees by the hour, not by the job (which is typical in the industry), eliminating the incentive that dealerships often have to rush through jobs or upsell customers on unnecessary "repairs."

27.     As Tesla's awards and accolades demonstrate, consumers have benefited tremendously from their exposure and access to Tesla's innovative products and business model.

### Tesla's Efforts to Establish Operations in Michigan

28.     Tesla wants to sell cars directly to consumers in Michigan, and it wants to establish service-and-repairs facilities in the State to better serve Michigan's Tesla owners.  To that end, Tesla has applied to the Michigan Department of State (the "Department") for the required regulatory approvals.  As further explained below, however, the Department has rejected all of Tesla's applications, thus depriving Tesla of the ability to operate in Michigan.

29.     On November 13, 2015, Tesla submitted two applications to the Department, one for a vehicle dealer license (required to sell new and used vehicles within the State), and the other to register a vehicle repair facility (required to service vehicles in the State).  After nearly nine months of back-and-forth correspondence, the Department noticed a hearing in August 2016, indicating its "intent to deny the dealer license."  The notice was accompanied by a complaint in which the Department took the position that Tesla's dealer license "should be denied."

30.     A hearing was held on September 7, 2016.  On September 12, 2016, Administrative Law Examiner Jay Thomas Todd sustained the Department's denial, in effect ruling that a vehicle manufacturer cannot sell new vehicles directly to consumers.  The Examiner further ruled that the Department should consider Tesla's application for a used vehicle dealer license, which is governed by different sections of the Michigan code.  On September 21, 2016, the Department denied Tesla's application for a used vehicle dealer license, citing Michigan Compiled Laws section 445.1574(1)(h) as the basis for its denial.  On December 19, 2016, the Department denied Tesla's application to register a vehicle repair facility, citing the prohibition in Michigan Compiled Laws section 445.1574(1)(q).

31.     In anticipation of the Department's denials, Tesla attempted to pursue legislative solutions that would allow it to operate in Michigan.  Those efforts also have been unavailing.  Specifically, in June 2016, representatives of Tesla met with representatives of Michigan's franchised dealer association and Michigan's automobile manufacturers, as well as Michigan legislators, to discuss a potential legislative compromise that would allow Tesla to sell and service its cars in Michigan.  At that meeting, Tesla was informed that the local Michigan dealers and manufacturers categorically oppose Tesla's entry into the Michigan retail and service market and that, without the support of those groups, the Legislature simply would not pass legislation that would allow Tesla to operate.  In the words of one legislator who attended the meeting: The Michigan dealers do not want you here.  The local manufacturers do not want you here.  So you're not going to be here.

### Section 445.1574 and the Anti-Tesla Amendment

32.     Section 445.1574 codifies the Anti-Tesla bill.  It provides that manufacturers "shall not," among other things, "sell any new motor vehicle directly to a retail customer other than through franchised dealers."   Mich. Comp. Laws Ann. § 445.1574(1)(i).   Pre-amendment

provisions also provide that manufacturers "shall not … [o]wn a motor vehicle service and repair facility." Mich. Comp. Laws Ann. § 445.1574(1)(q). In other words, Section 445.1574 prevents manufacturers from selling cars directly to consumers in Michigan and even from servicing cars at facilities within the State. Section 445.1574 also prohibits manufacturers from owning, operating, or controlling a new or used motor vehicle dealer. Mich. Comp. Laws Ann. § 445.1574(1)(h). Tesla does not propose to own, operate, or control a dealer; it simply wants to sell cars directly to consumers. But to the extent the State is relying on sub-provision (1)(h) to deny Tesla a sales license, that sub-provision is likewise unlawful.

33. Unlike Tesla, the franchised dealers and manufacturers at issue here have their headquarters in Michigan. Thus, Section 445.1574 creates a monopoly in favor of Michigan-based franchised dealers and benefits Michigan's local manufacturers (who sell their cars through dealers) by blocking Tesla from operating within the State. In legislating this outcome, Michigan has fomented the very "economic Balkanization that had plagued relations among the [States] … under the Articles of Confederation." *Hughes v. Oklahoma*, 441 U.S. 322, 325–26 (1979).

34. Section 445.1574 was originally enacted as part of a Section of the Michigan Compiled Laws entitled "Regulation of Motor Vehicle Manufacturers, Distributors, Wholesalers, and Dealers." Mich. Comp. Laws Ann. § 445 ("Section 445"). Enacted in 1981, Section 445 was intended "to regulate dealings between manufacturers, distributors, wholesalers, dealers, and consumers" and "to prohibit unfair practices." Mich. Comp. Laws Ann. § 445 (General Notes). Consistent with that purpose, Section 445 consists almost entirely of regulations dealing with the relationship between a manufacturer and its own independent, franchised dealers. For example, Section 445 governs matters such as when and how a manufacturer may cancel, terminate, not renew, or discontinue a dealer agreement (§ 445.1567, 445.1568); notice and compensation

requirements for terminating a dealer agreement (§ 445.1570-72); conduct by manufacturers toward dealers (§ 445.1573-74a); and succession and relocation of dealerships (§ 445.1575-77). Section 445's clear purpose was to ensure fairness in *relationships* between powerful manufacturers and their less-powerful, independent dealers.

35.    As part of this scheme, and consistent with its principal purpose of regulating manufacturers' relationships with their franchised dealers, Section 445.1574 originally prohibited a manufacturer from selling "any new motor vehicle directly to a retail customer other than through ***its*** franchised dealers."  (Emphasis added.)  By using the possessive "***its***," the legislature limited the direct-sale prohibition to manufacturers that actually had franchised dealers.  Although most, if not all, manufacturers were then selling cars through franchised dealers, Section 445.1574's plain language did not prohibit sales by manufacturers, such as Tesla, with no independent, franchised dealers.[10]

36.    On May 28, 2014, the Michigan House of Representatives introduced Enrolled House Bill 5606 ("H.B. 5606") to amend Section 445.1574.  As introduced, the bill had nothing to do with Tesla and was typical of the give-and-take between manufacturers and their franchised dealers.  As introduced, the bill addressed a longstanding dispute between manufacturers and their affiliated dealers over excessive document preparation fees being charged by dealers in connection with car sales.  Manufacturers had previously sought to limit those fees in order to protect their customers, but the dealers fought back, seeking to be able to charge customers whatever fees they desired.  In response to pressure from the dealers' lobby, H.B. 5606 was introduced to prevent

---

[10] Section 445.1574(1)(h) did not bar direct sales by non-franchising manufacturers like Tesla because it only precluded manufacturers from owning new vehicle dealerships in competition with their franchised dealers.

manufacturers from restricting their affiliated dealers' add-on fees. The bill remained unchanged for over four months, and in this form, H.B. 5606 would not have affected Tesla at all.

37.     H.B. 5606 became the "Anti-Tesla Bill" on the last day of the legislative session, when Senator Joe Hune proposed changes to H.B. 5606 that would preclude manufacturers from selling directly to consumers, regardless of whether the manufacturer had franchised dealers. In particular, at the dealers' behest, Senator Hune struck the word "its" from Section 445.1574, such that a manufacturer would be barred from selling "any new motor vehicle directly to a retail customer other than through *its* franchised dealers." (Emphasis and alteration added). By removing the word "its," Senator Hune's eleventh-hour changes would fundamentally alter Michigan law by requiring for the first time that all new vehicle sales in Michigan be conducted exclusively "through franchised dealers."

38.     With the powerful dealers' lobby pushing it, the Anti-Tesla bill sailed through the Legislature. Indeed, the amended bill was introduced on October 1, 2014, and passed both the Senate and the House on October 2, 2014. As a result of this rapid turnaround, the late additions to the bill were enacted without any public comment, debate, or opportunity for argument. Accordingly, neither Tesla nor the public at large even learned about the Anti-Tesla prohibition until after the Legislature approved the bill. This was important to the bill's proponents, who knew that the amendment would draw significant criticism if publicized.

39.     Upon news of its passage, the media and public immediately recognized the bill's purpose and effect, dubbing H.B. 5606 the "Anti-Tesla" bill. Tesla and others protested vehemently, asking the Governor to veto the bill and pointing out its protectionist, anti-competitive effects. But pressure from the local dealers' lobby was immense, and further intensified when Michigan's General Motors threw its weight behind the bill.

40.     Governor Snyder signed the bill into law on October 21, 2014.  In response to criticism, the Governor assured the public that H.B. 5606 effected no change in the law as to Tesla because Michigan law had always barred non-franchising manufacturers from selling vehicles within the State.   But as noted above, before the amendment, Michigan law only barred manufacturers from selling cars to consumers if they had franchised dealers in state, a rational prohibition preventing manufacturers from undercutting dealers with whom they had franchise agreements.  By striking the word "its" from Section 445.1574, the Legislature and Governor unequivocally transformed the law, effecting a blanket prohibition against a manufacturer selling "any new motor vehicle directly to a retail customer other than through *its* franchised dealers." Amended Section 445.1574 thus creates a legal monopoly for franchised dealers, guards Michigan manufacturers from competition, and excludes Tesla from the market.

41.     There can be no question that General Motors views state-law direct-sales bans as a competitive weapon against Tesla.  General Motors touted this competitive advantage in January 2016, when it announced the 2017 all-electric Chevy Bolt at the Consumer Electronics Show in Las Vegas.  In her keynote speech, General Motors Chairman and CEO, Mary Barra, took a direct swipe at Tesla's inability to sell its cars directly to consumers or to service them at in-state locations: "[u]nlike some EV [electric vehicle] customers, Bolt EV customers never have to worry about driving to another state to buy, service or support their vehicles."

**The Dealer Model Is Not Viable for Tesla**

42.     Tesla has determined that its direct sales model is the only viable means for selling its cars.  As described above, Tesla's direct sales model has proven to be a highly effective means of selling Tesla's innovative electric vehicle technology.  As Tesla's experience shows, customers are willing to adopt this new technology when given significant time to learn about it in the environment of Tesla's stores.  As a market entrant with a novel product, Tesla believes that the

traditional dealer model—incentivizing high-pressure, high-volume sales at the highest negotiable price, with as many add-ons and surcharges as possible—would be a disastrous way to bring Tesla's novel cars to market. Additionally, because Tesla maintains control of its sales and service operations, it is able to provide the highest level of customer service at all stages of the car-buying and ownership process, thereby solidifying its reputation and building goodwill.

43.     But even if the independent dealership model were an effective means of selling Tesla cars (which it is not), hypothetical Tesla franchised dealerships would not make a sufficient profit to stay in business. A franchised dealer would be unable to profit from the sale of new cars because Tesla's uniform sales price does not include the dealer mark-up that consumers normally have to pay. Moreover, a hypothetical franchised dealer could not simply tack on its own markup because it could not then compete with the uniform prices offered by Tesla. If a hypothetical dealer attempted to do so, customers would simply choose to purchase the car at Tesla's lower price through Tesla's website or at a Tesla store in another state. (Tesla is licensed to sell cars in many neighboring states, including Indiana, Illinois, Ohio, and Pennsylvania, as well as in Ontario, Canada.) In addition, franchised dealers rely heavily on profits from the sale of service and parts and used cars to support their operations. And unlike Tesla, dealers also substantially mark up financing, insurance products, and other "add-ons." However, these sources of profits, are much more limited—and, in some cases, nonexistent—with respect to Tesla cars.

### Amended Section 445.1574 Does Not Further Any Legitimate State Interest

44.     By design, Section 445.1574 creates a monopoly in favor of franchised dealers with respect to selling and servicing new cars, and it excludes Tesla from the Michigan market because Tesla does not, and could not, use the dealer model. Section 445.1574 also protects Michigan's local vehicle manufacturers, which use the franchise model, from competition by Tesla. Thus, as

16

applied to Tesla, Section 445.1574 is a purely protectionist measure that does not further any legitimate state interest, as the U.S. Constitution requires.

45.     Section 445.1574(1)(h)'s ban on manufacturer used car sales also serves no legitimate state interest as applied to Tesla, and further exposes the protectionist nature of the regime.  The statute allows any "person" (whether franchised by a manufacturer or not) to establish a used vehicle dealership, subject only to basic requirements like insurance and a criminal background check, *e.g.*, Michigan Comp. Laws Ann. §§ 257.248(1)-(6); 445.1566(4), but arbitrarily excludes Tesla from establishing such a dealership solely because it is also a manufacturer. Even if such a prohibition could be regarded as a reasonable limitation on the ability of franchising manufacturers to compete unfairly against their own dealers, it serves no rational purpose as applied to Tesla, which only sells directly to consumers. As applied to Tesla, the prohibition serves only to reduce beneficial competition for used car sales, to block Tesla from pursuing a legitimate business, and to deny Michigan consumers access to Tesla's acclaimed sales and service model.

46.     Original Section 445.1574 was enacted to ensure fairness in *relationships* between powerful manufacturers and their less-powerful, independent dealers.  *See supra* ¶¶ 34-35.  But applying the law to Tesla cannot further Section 445.1574's purpose because Tesla has never used a franchised dealership model.

47.     Conversely, Section 445.1574 unquestionably harms consumers.  Preventing a non-franchising manufacturer like Tesla from selling cars within the state of Michigan removes a competitor from the marketplace.  Increasing competition enhances consumer choice and reduces prices, whereas reducing competition takes choice away from consumers and increases prices. Moreover, there has been no showing—nor could there be—that the dealer model is otherwise

better for consumers.  Surveys show that consumers overwhelmingly support Tesla's ability to sell its cars directly to the public.

48.     Additionally, Section 445.1574's service prohibition is patently anti-consumer and is irrational on its face.  There is no reason to bar Tesla from establishing facilities in the State to service and repair Michigan residents' Tesla vehicles, nor to subject Michigan's Tesla owners to substantial inconvenience—and require them to overcome senseless hurdles—simply to obtain needed repairs and service.  When applied to Tesla, Section 445.1574's undeniable effect is to require Tesla owners to drive longer and travel farther precisely when their cars are in need of repair.  This is an illogical outcome antithetical to consumer and public safety.  Moreover, as noted above, Tesla's service centers have been rated significantly higher than all other service centers in the nation—including those owned by franchised dealers—for on-time repairs, courtesy, price, quality, and overall satisfaction.[11]  There simply is no plausible justification for a law that makes it harder, more expensive, and more time-consuming for Michigan residents to have their cars repaired.

49.     Tesla is not alone in recognizing the anti-competitive, anti-consumer nature of direct sales bans.  The FTC's Office of Policy Planning and several staff attorneys have written extensively on the harmful effects of states' efforts to restrict direct-to-consumer sales of automobiles, and have specifically urged legislatures to lift prohibitions on Tesla's direct sales.[12]

---

[11] *Independent vs. dealer shops for car repair, A Consumer Reports survey shows how dealerships and independent shops compare by brand* (January 22, 2015), http://www.consumerreports.org/cro/magazine/2015/03/best-places-to-get-your-car-repaired/index.htm.

[12] *See, e.g., Direct-to-Consumer Auto Sales: It's Not Just About Tesla,* FTC blog Competition Matters, https://www.ftc.gov/news-events/blogs/competition-matters/2015/05/direct-consumer-auto-sales-its-not-just-about-tesla; *FTC Staff: Missouri and New Jersey Should Repeal Their Prohibitions on Direct-to-Consumer Auto Sales by Manufacturers,* FTC Press Release,

For example, in a jointly authored piece, the Directors of the FTC's Office of Policy Planning, Bureau of Competition, and Bureau of Economics wrote:

> [The FTC] ha[s] consistently urged legislators and regulators to consider the potential harmful consequences [efforts to bar new business models] can have for competition and consumers.  How manufacturers choose to supply their products and services to consumers is just as much a function of competition as what they sell—and competition ultimately provides the best protections for consumers and the best chances for new businesses to develop and succeed.  Our point has not been that new methods of sale are necessarily superior to traditional methods—just that the determination should be made through the competitive process.[13]

50.     In addition, in a March 26, 2014 letter to New Jersey Governor Chris Christie, seventy-two leading "professors and scholars of law, business, economics, and public policy with expertise in industrial organization, distribution, competition, intellectual property, innovation and related fields" joined together to "express [their] concerns regarding the recent decision of the New Jersey Motor Vehicle Commission to prohibit direct distribution of automobiles by manufacturers."[14]  The professors and scholars explained:

> There is no justification on any rational economic or public policy grounds for such a restraint of commerce. Rather, the upshot of the regulation is to reduce competition in New Jersey's automobile market for the benefit of its auto dealers and to the detriment of its consumers. It is protectionism for auto dealers, pure and simple.[15]

So too with Section 445.1574, which is patent "protectionism for auto dealers, pure and simple."

---

https://www.ftc.gov/news-events/press-releases/2014/05/ftc-staff-missouri-new-jersey-should-repeal-their-prohibition.

[13] *Who Decides How Consumers Should Shop*, FTC blog Competition Matters, https://www.ftc.gov/news-events/blogs/competition-matters/2014/04/who-decides-how-consumers-should-shop.

[14] Letter to Governor Christie from the International Center for Law & Economics (March 26, 2014), https://law.wm.edu/documents/Tesla_letter.pdf.

[15] *Id.*

**Section 445.1574, Including the Anti-Tesla Amendment,
Violates Tesla's Constitutional Rights**

51.    Defendants' application of Section 445.1574's manufacturer-direct sales and service prohibitions to Tesla has no legitimate rational basis.  Tesla has never sold cars through an independent dealership and therefore cannot engage in unfair business practices vis-à-vis a franchised dealer.  Moreover, as discussed above, the dealer model is not feasible for Tesla. Requiring Tesla to abide by Section 445.1574 and to contract with franchised dealers would not serve any legitimate government purpose, as discussed above.

52.    Defendants' denial of Tesla's applications for a vehicle dealer license and vehicle repair facility registration discriminates against and imposes a substantial burden on interstate commerce, and is not a reasonable means to achieve any legitimate government purpose. Through Defendants' enforcement of Section 445.1574, Tesla is injured irreparably by the past, present, and future violations of the Due Process, Equal Protection, and Commerce Clauses of the U.S. Constitution.

**CLAIMS FOR RELIEF**

**First Claim for Relief
U.S. Const. Amend. XIV, Due Process
42 U.S.C. Section 1983**

53.    Tesla re-alleges and incorporates by reference each and every allegation set forth in ¶¶ 1 through 52 of this Complaint, as if fully set forth herein.

54.    The Due Process Clause of the Fourteenth Amendment to the U.S. Constitution protects every person's right to pursue legitimate business interests subject only to regulations that are rationally related to a legitimate government purpose.

55.    As applied, Section 445.1574 violates Tesla's right to due process under the Fourteenth Amendment to the U.S. Constitution.  Prohibiting a non-franchising manufacturer, like

Tesla, from selling or servicing cars in Michigan is not a rational means of achieving any legitimate government purpose. Such a manufacturer cannot have any competitive advantage or market power over its non-existent dealers, and excluding it from the marketplace thwarts competition, increases prices, and deprives consumers of products that they want. As applied to Tesla, Section 445.1574's only possible purpose is to protect two discrete Michigan-based interest groups— Michigan's franchised auto dealers and Michigan-based manufacturers—from economic competition. This is not a legitimate governmental purpose.

56.     Unless the Defendants are enjoined from violating the Fourteenth Amendment, Tesla will continue to suffer great and irreparable harm.

### Second Claim for Relief
### U.S. Const. Amend. XIV, Equal Protection
### 42 U.S.C. Section 1983

57.     Tesla re-alleges and incorporates by reference each and every allegation set forth in ¶¶ 1 through 56 of this Complaint, as if fully set forth herein.

58.     The Equal Protection Clause of the Fourteenth Amendment to the U.S. Constitution prohibits the State of Michigan from making arbitrary and unreasonable classifications. A state violates the Equal Protection Clause when it treats one set of persons differently from others who are similarly situated and there is no rational basis for the differential treatment.

59.     As applied, Section 445.1574 violates Tesla's right to equal protection under the Fourteenth Amendment to the U.S. Constitution. By prohibiting Tesla from selling and servicing Tesla cars in Michigan, Defendants are distinguishing without legitimate justification between (a) manufacturer-owned dealerships, such as Tesla, and (b) franchised dealerships that are not owned by manufacturers, which are similarly situated in all material respects. Defendants are also distinguishing without legitimate justification between (a) non-Michigan-based manufacturers like

Tesla, which do not use franchised dealerships as part of their sales model, and (b) Michigan-based manufacturers like General Motors, which do.  These irrational classifications do not further any legitimate government interest and exist solely for the purpose of protecting two discrete Michigan-based interest groups—Michigan's franchised auto dealers and Michigan-based manufacturers—from economic competition.  This is not a legitimate governmental purpose.

60.     Unless Defendants are enjoined from violating the Fourteenth Amendment, Tesla will continue to suffer great and irreparable harm.

**Third Claim for Relief**
**U.S. Const. Art. I, Dormant Commerce Clause**
**42 U.S.C. Section 1983**

61.     Tesla re-alleges and incorporates by reference each and every allegation set forth in ¶¶ 1 through 60 of this Complaint as if fully set forth herein.

62.     The United States Constitution empowers Congress "[t]o regulate Commerce . . . among the several States."  U.S. Const. art. I, §§ 8, cl. 3.  The Commerce Clause also has a negative aspect, referred to as the dormant Commerce Clause, which restricts state and local governments from impeding the free flow of goods from one state to another.  The dormant Commerce Clause prevents states from promulgating protectionist policies, i.e., regulatory measures aimed to protect in-state economic interests by burdening out-of-state competitors.

63.     As applied to Tesla, Section 445.1574 violates the dormant Commerce Clause. Prohibiting Tesla from selling and servicing cars in Michigan except through independent franchised dealers impermissibly discriminates against interstate commerce by impeding the flow of out-of-state-manufactured vehicles into Michigan and by favoring in-state interests (Michigan franchised dealers and Michigan-based vehicle manufacturers) over out-of-state interests (Tesla).

64. Prohibiting a non-franchising manufacturer from selling or servicing cars in Michigan does not advance any legitimate local purpose that cannot be adequately served by reasonable nondiscriminatory alternatives. As applied to Tesla, the only possible purpose behind Section 445.1574 is to protect two discrete Michigan-based interest groups—Michigan's franchised auto dealers and Michigan-based manufacturers—from economic competition. This is not a legitimate governmental purpose.

65. As applied to Tesla, Section 445.1574 violates the dormant Commerce Clause for the independent reason that it imposes a burden on interstate commerce that is clearly excessive in relation to any conceivable local benefit. As explained above, the only "benefit" of Section 445.1574 is economic protection for local dealers and manufacturers, which is not a legitimate purpose under the dormant Commerce Clause.

66. Section 445.1574's service prohibition, as applied to Tesla, also violates the dormant Commerce Clause by impeding the flow into Michigan of vehicles manufactured and purchased outside of the State. Specifically, Section 445.1574 prevents Tesla from servicing a vehicle located in Michigan, even when the consumer purchased that vehicle entirely outside the State, thus creating a severe disincentive for Michigan residents to purchase Tesla vehicles outside of the State.

67. Unless Defendants are enjoined from violating the dormant Commerce Clause, Tesla will continue to suffer great and irreparable harm.

## PRAYER FOR RELIEF

WHEREFORE, Tesla respectfully requests the following relief:

A. On an expedited basis, pursuant to Federal Rule of Civil Procedure 57, for entry of judgment declaring that Tesla is entitled to new and used vehicle dealer licenses and a permanent injunction ordering the Defendants to grant Tesla such vehicle dealer licenses;

B.      On an expedited basis, pursuant to Federal Rule of Civil Procedure 57, for entry of judgment declaring that Tesla is entitled to a vehicle repair facility registration and a permanent injunction ordering the Defendants to grant Tesla a vehicle repair facility registration;

C.      On an expedited basis, pursuant to Federal Rule of Civil Procedure 57, for entry of judgment declaring that Michigan Compiled Laws Section 445.1574 is unconstitutional as applied to Tesla;

D.      For entry of a permanent injunction prohibiting Defendants from denying Tesla's applications for new and used vehicle dealer licenses;

E.      For entry of a permanent injunction prohibiting Defendants from denying Tesla's application for a vehicle repair facility registration;

F.      For entry of a permanent injunction prohibiting Defendants' enforcement of Michigan Compiled Laws Section 445.1574 (or any other provision) in a manner that impairs Tesla's ability to own, operate, and control new or used vehicle dealerships in the State of Michigan and prohibiting the imposition of fines or penalties, or otherwise subjecting Tesla to any form of harassment;

G.      For entry of a permanent injunction prohibiting Defendants' enforcement of Michigan Compiled Laws Section 445.1574 (or any other provision) in a manner that impairs Tesla's ability to own, operate, and control service centers in the State of Michigan and prohibiting the imposition of fines or penalties, or otherwise subjecting Tesla to any form of harassment;

H.      For an award of attorney fees, costs, and expenses in this action pursuant to 42 U.S.C. § 1988; and

I.      For such further legal and equitable relief as the Court may deem just and proper.

Dated: January 27, 2017

By:  /s/ John J. Bursch
      John J. Bursch
      BURSCH LAW, PLLC
      9339 Cherry Valley Ave. SE, #78
      Caledonia, Michigan 49316
      (616) 450-4235
      jbursch@burschlaw.com

      *Counsel for Tesla Motors, Inc.*

Of Counsel:
O'MELVENY & MYERS LLP
Daniel Petrocelli
1999 Avenue of the Stars, 8th Floor
Los Angeles, CA 90067
(310) 553-6700
dpetrocelli@omm.com

Anne Huffsmith
Two Embarcadero Center, 28th Floor
San Francisco, CA 94111
(415) 984-8934
ahuffsmith@omm.com

## CERTIFICATE OF SERVICE

This certifies that the foregoing document was served January 27, 2017, by electronic

mail using the Eastern District of Michigan's Electronic Case Filing system on:  DJ Pascoe and

Matthew Payok.


*/s/John J. Bursch*

John J. Bursch (P57679)